608 S.E.2d 865

**In the Matter of Richland County Magistrate
Clemon L. STOCKER, Respondent.**

No. 25938.

Supreme Court of South Carolina.

Submitted Jan. 4, 2005.
Decided Feb. 7, 2005.

Henry B. Richardson, Jr., Disciplinary Counsel, and Robert E. Bogan, Assistant Deputy Attorney General, both of Columbia, for The Office of Disciplinary Counsel.

Charlie J. Johnson, Jr., and John T. Mobley, both of Columbia, for respondent.

PER CURIAM:

In this judicial disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into two Agreements for Discipline by Consent pursuant to Rule 21, RJDE, Rule 502, SCACR. In Agreement # 1, respondent admits misconduct and consents to the imposition of a letter of caution, admonition, or public reprimand pursuant to Rule 7(b), RJDE, Rule 502, SCACR. We accept Agreement # 1 and impose a public reprimand. In Agreement # 2, respondent admits misconduct and consents to the imposition of an admonition, public reprimand, or a definite suspension not to exceed thirty (30) days pursuant to Rule 7(b), RJDE, Rule 502, SCACR. We accept Agreement # 2 and impose a definite suspension of thirty (30) days. The facts as set forth in the Agreements are as follows.

## FACTS

### *AGREEMENT # 1*

#### *I.*

Respondent is a Richland County Magistrate. Plaintiff A filed a civil complaint in respondent's magisterial office on January 12, 2001. She alleges she was advised by the receptionist at respondent's office that trial would be in about three or four weeks and that she would be notified by mail.

Plaintiff A alleges she contacted respondent's office in mid-February and was told the defendant had been served on January 19, 2001, that a hearing would be scheduled within two weeks, and that she would receive a letter soon. Plaintiff A alleges she called respondent's office in March and left a message that was not returned. Plaintiff A alleges she called respondent's office again in April, was told respondent was busy "filling in for other judges downtown," that he would be

back to his regular schedule soon, and she would hear something shortly.

On August 29, 2001, Plaintiff A complained by letter to the Chief Magistrate about respondent's failure to set the matter for trial and respondent's lack of response to her inquiries. In the letter, respondent asked to transfer the matter to another magistrate or for a refund of her $55.00 filing fee if transfer to another magistrate could not be arranged.

The Chief Magistrate contacted respondent about Plaintiff A. Respondent discovered that Plaintiff A's complaint was inadvertently marked by court staff to indicate that the defendant requested a jury trial and the complaint was thereafter placed in the jury trial cabinet to await its turn for placement on the jury docket. Respondent also represents that, at that time, cases placed on the jury roster generally took eighteen months to reach a trial, which was the cause of the delay in Plaintiff A's case.

Respondent further explains that none of his office staff remember receiving any inquiries from Plaintiff A and that he was not made aware of Plaintiff A's communications, if any were made as she alleges. While respondent cannot confirm the representations made by Plaintiff A, for purposes of Agreement # 1, they are not contested.

Plaintiff A's matter was subsequently assigned to another magistrate and has been resolved.

## II.

In October 2000, Ronald L. Hall, Esquire, filed a complaint in respondent's court on behalf of Plaintiff B against Defendant B concerning a $2,250.00 check Defendant B wrote to a third party and which the third party subsequently signed over to Plaintiff B. According to the complaint, the check was returned for insufficient funds.

By January 2001, Mr. Hall had not heard anything further about the matter and contacted respondent's office by letter dated January 8, 2001, but received no response. In February 2001, Mr. Hall was informed that the file may have been misplaced in respondent's office; Mr. Hall mailed respondent another copy of the Summons and Complaint. Respondent

represents to ODC that the Sheriff's Department lost the paperwork after it was sent to be served.

By letter dated March 19, 2001, respondent made further inquiry about the status of the case. Respondent executed another Summons dated March 30, 2001.

Defendant B was served on April 6, 2001, and, according to respondent's files, filed an Answer on April 30, 2001, alleging the check was returned in error and that a replacement check was issued to Plaintiff B. Defendant B's Answer was not served on Mr. Hall.

On May 8, 2001, Mr. Hall wrote respondent stating he had been informed by his client that the matter might be set for a hearing on the merits around June 1, 2001. A bench trial was held on June 15, 2001. At the hearing, Mr. Hall was not aware that Defendant B had answered and he objected to Defendant B being allowed to contest the case on the merits. After hearing the evidence, which included that Defendant B issued a replacement check and that Plaintiff B had negotiated both checks, respondent took the matter under advisement.

In June and July, Mr. Hall inquired about when respondent would issue a ruling. Mr. Hall's letter of July 16, 2001, states: "I do note that we never received a copy of the Answer of [Defendant B]; and therefore presumed he was in default. If this is incorrect, I would appreciate receiving a copy of [Defendant B's] Answer for my file." Respondent did not answer this correspondence. Respondent states it is his recollection that Mr. Hall was shown Defendant B's Answer during the hearing on June 15, 2001.

Mr. Hall wrote respondent on August 8, 2001, stating he understood from contacts with respondent's office that respondent's busy schedule had kept him from ruling on this matter. Mr. Hall included a proposed transcript of judgment. Respondent did not answer this correspondence.

On September 10, 2001, Mr. Hall complained to Chief Magistrate Womble about respondent's handling of this case. Judge Womble contacted respondent by telephone. The same day, respondent issued a ruling in favor of Defendant B.

Mr. Hall alleged in his complaint to ODC that the ruling in favor of Defendant B appeared to be retaliation against him

for complaining to the Chief Magistrate. Respondent represented to ODC that his ruling had actually been prepared in July, but had not been published, and that Judge Womble's call reminded him of the ruling. Respondent denied his ruling was issued in retaliation for Mr. Hall's complaint.

Mr. Hall appealed respondent's ruling to the circuit court. As of March 1, 2002, respondent had not submitted a return. On March 2, 2002, Judge Manning issued an order stating respondent had thirty (30) days to submit a return or provide the tape recording of the proceedings to Mr. Hall for transcription. If the return was not prepared within thirty (30) days, the case would be remanded to the Chief Magistrate to determine whether a new trial would be necessary.

The tape of the proceedings in Magistrate's Court was unavailable. Respondent states it was re-used in the normal course of court activity.

The matter was ultimately remanded back to the Chief Magistrate. A new trial was held and judgment for Plaintiff B was entered.

Respondent explains he did not respond to Mr. Hall's correspondence because it was placed directly in the file by his staff. He has corrected his office practices to ensure that all correspondence comes to his desk before being placed in the file.

## AGREEMENT # 2

### I.

On the evening of Saturday, April 14, 2001, Defendant C allegedly struck Victim in the head with a handgun while the Victim was visiting Defendant C's residence. The incident is alleged to have occurred in connection with Defendant C accusing Victim of having an affair with Defendant C's wife as Victim was trying to leave the premises.

Victim's Mother is a friend of respondent and his wife and attends the same church as respondent. Victim's Mother approached respondent at church the next day about issuing a warrant for Defendant C who is respondent's third cousin.

Respondent instructed Victim's Mother to come to his office the next day and apply for a warrant.

The next morning, Victim and Victim's Mother appeared at respondent's office to apply for a warrant against Defendant C. Certain paperwork necessary for issuance of the warrant was completed and respondent indicated he would issue an arrest warrant against Defendant C for assault and battery of a high and aggravated nature (ABHAN).

Respondent estimates that approximately two hours later, Defendant C appeared at respondent's office inquiring whether a warrant had been issued for his arrest. Upon being informed that a warrant was being prepared, Defendant C inquired about obtaining a warrant against Victim for trespassing and asked respondent whether Victim might drop the warrant if he paid the medical bills. Respondent declined to issue the "cross warrant" and told Defendant C he had no control over whether Victim would drop the ABHAN warrant.

Respondent reports that Victim's Mother called on Tuesday to determine whether the warrant had been issued. Respondent informed her it was still being prepared and told her Defendant C had been to the office to seek a warrant against her son for trespassing. Respondent reports that Victim's Mother said something to the effect of "hold up on the warrant" and she would call him back. Respondent further states that Victim's Mother called back the next day and said go forward with the warrant.

Victim's Mother's recollection of what appears to be the same conversation is somewhat different. She reports receiving a telephone call at her home from respondent. Based on this conversation, Victim's Mother believed respondent had talked with Defendant C prior to this phone call. Victim's Mother's recollection is that respondent indicated Defendant C may have been justified in assaulting Victim and it is her perception that respondent might have been suggesting the warrant against Defendant C be dropped.

Respondent testified in his interview under oath that the warrant was signed on Wednesday or Thursday (April 18 or 19) and "went out" on Friday (April 20). It is customary that warrants are picked up at least once a day and usually twice a day from respondent's office by deputies assigned to the

sheriff's warrant division. Victim's signature is purported to have been affixed to the typed warrant on April 16, 2001.

Sometime on Saturday or Sunday (April 21 or 22), Defendant C called respondent at home and stated he wanted to turn himself in to authorities. Defendant C sought instructions from respondent on how to do so without interfering with Defendant C's work schedule and respondent instructed Defendant C to turn himself in at the jail at 2:00 p.m. on Monday so he could attend the 4:00 p.m. bond hearing. Respondent had further conversation with Defendant C about the facts and merits of the matter.

On Monday, respondent contacted the sheriff's warrant division, advised Defendant C would turn himself in that afternoon, and said he would like to get the warrant and take it to the jail where Defendant C would turn himself in. The Sheriff's Department returned the warrant to respondent and respondent delivered it to bond court at the detention center around noon. Respondent believes this is the first time he ever retrieved a warrant from the warrant division so that someone could turn himself or herself in to authorities.

At some point later that day, respondent telephoned Magistrate Hudnell who was scheduled to hold 4:00 p.m. bond hearings. Knowing Magistrate Hudnell had set a high bond of $35,000 in another case a week earlier and wanting to be sure appropriate bond would be set in Defendant C's matter, respondent contacted Magistrate Hudnell to inform her that Defendant C would be a "walk-in" for the 4:00 p.m. bond hearing, that Defendant C was respondent's cousin, that respondent knew the Victim from church and the neighborhood, and asked Magistrate Hudnell to "give [Defendant C] a low surety bond and ten percent." Respondent also relayed the version of the facts and circumstances underlying the warrant as given to him by Defendant C to Magistrate Hudnell. According to Magistrate Hudnell, respondent said he had also told Defendant C he probably would get a low bond. Respondent represents to ODC that it is not unusual for a magistrate who has information about a case to contact the bond court magistrate and give a bond suggestion.

Defendant C was present for the 4:00 p.m. bond hearing, but the warrant had not been served, he had not been booked

into the jail, and Victim had not been contacted. Defendant C was booked into the detention center to await a bond hearing the next morning (April 24). On April 24, Magistrate Hudnell set Defendant C's bond at $7,500.00. Defendant C was able to make bond that same day. Five days later, Defendant C murdered his wife.

Respondent now recognizes and acknowledges it was outside the scope of his authority to become involved in effectuating or arranging Defendant C's arrest and that, in doing so, he was using his judicial office for the benefit of another and his conduct was indicative of bias. Respondent now recognizes and acknowledges that it was inappropriate to have had ex parte conversations with Victim's Mother once the warrant was issued, to try to influence the amount of bond set by Magistrate Hudnell, and to discuss Defendant C's version of events with Magistrate Hudnell.

## II.

Respondent presided over civil proceedings where Plaintiff D was granted a judgment for $4,080.11 plus court costs against Defendant D for telephone calls Defendant D made on Plaintiff D's cell phone. Plaintiff D later came before respondent complaining Defendant D had not satisfied the judgment. Respondent told Defendant D, a dancer, to get a "regular job," and told the parties he did not want to see them in court again.

Plaintiff D later came before respondent complaining Defendant D had not satisfied the judgment. A hearing was convened. Defendant D informed the court that she had not paid the judgment, that she had enrolled in training classes, and that she would be paid while in training. Respondent concluded the hearing by stating, "Alright, well you didn't do what I asked you to do and I have no other choice. I have no choice but to cite you for contempt and send you to jail for thirty days or you can pay a $500 fine. I'm sorry, ma'am. And when you get out you are still going to owe this money. Good day."[1]

---

1. ODC is informed that Defendant D was placed in custody in the presence of her child.

Respondent stated in his interview under oath that he held Defendant D in contempt because she failed to get a job as he ordered, not because she failed to pay the judgment. Respondent further stated in the interview that it was his intention to only leave Defendant D in jail for three or four days, but forgot about her until the Chief Magistrate called him about the matter five or six days later, after which he had Defendant D released.

Respondent now recognizes that he lacked authority to order Defendant D to get a job, that he lacked authority to hold Defendant D in contempt for failing to get a job or failing to pay a judgment, that the sentence for contempt was without legal authority, and, as a result of the foregoing, he was not faithful to the law.

### III.

On June 21, 2001, Defendant E was arrested by a state trooper on charges of driving under the influence (DUI), simple possession of marijuana, and violation of the seat belt law. Defendant E is the son of the office manager for Richland County Magistrate Golie Augustus. The tickets were scheduled to be tried on July 19, 2001 before Richland County Magistrate Harold A. Cuff.

Court personnel report that on July 19, 2001, the trooper appeared in magistrate's court and asked to mark the DUI ticket as nolle prossed.[2] Court personnel told the trooper they could not honor the request and the trooper left the building, stating he had to go to his car. Court personnel report that, after being seen in the court parking lot with Magistrate Augustus and another person looking at the engine of a car, the trooper returned to the magistrate's office and stated Defendant E wanted a jury trial.[3]

Court personnel further report the trooper saying respondent called him "about a month ago" concerning these

---

[2]. During an internal affairs investigation, the trooper denied making this statement. The internal affairs investigation has been closed as "unfounded."

[3]. The trooper denied having any discussion with Magistrate Augustus concerning this matter.

charges. The trooper opined that the cases would probably be transferred to Magistrate Peay and dismissed.

Respondent acknowledges discussing the pending charges with the trooper after traffic court one day. At the time, the trooper stated he planned to "take care" of all charges except the simple possession of marijuana charge. Respondent represents this contact was an inquiry about the charges and certain procedures (specifically, how someone could be charged with DUI if he blew a zero on the datamaster) and denies that any attempt was made to persuade or influence the trooper not to prosecute the charges. These discussions occurred outside the presence of Defendant E.

Respondent also acknowledges having discussed the pending charges, including the possibility of obtaining a conditional discharge, with Defendant E outside the presence of the trooper. Respondent acknowledges being at Central Court on other matters on the day Defendant E's charges were to be heard by Magistrate Cuff and approaching Magistrate Cuff to inform him that Defendant E would plead guilty to simple possession of marijuana and request a conditional discharge.

Magistrate Cuff confirmed that respondent visited him on July 19, 2001, shortly before these matters were to be heard. Magistrate Cuff reported that, during this visit, respondent stated the trooper called respondent and told him he would drop the DUI and enter a conditional discharge of the possession of marijuana case. According to Magistrate Cuff, respondent did not request or instruct him to handle the matter a certain way.

ODC is informed that the matters were ultimately assigned to a Lexington County Magistrate, that the DUI charge was nolle prossed by the trooper, the simple possession charge was conditionally discharged, and Defendant E was given a one day suspended sentence on the seat belt charge.

Respondent now recognizes and acknowledges that his ex parte conversations with Defendant E and the trooper were inappropriate and constitute judicial misconduct.

## *LAW*

By his misconduct, respondent has violated the following Canons of the Code of Judicial Conduct: Canon 1 (judge shall uphold integrity of the judiciary); Canon 1A

(judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved); Canon 2 (judge shall avoid impropriety and the appearance of impropriety in all activities); Canon 2A (judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary); Canon 2B (judge shall not allow family, social, political or other relationships to influence the judges judicial conduct or judgment); Canon 3 (judge shall perform the duties of judicial office impartially and diligently); Canon 3(A) (judges judicial duties take precedence over all of judges other activities); Canon 3B(2) (judge shall be faithful to the law and maintain professional competence in it); Canon 3(B)(7) (judge shall not initiate, permit, or consider ex parte communications); Canon 3B(8) (judge shall dispose of all judicial matters promptly, efficiently, and fairly); Canon 3(C)(2) (judge shall require staff to observe standard of fidelity and diligence that apply to judge); and Canon 3(E)(judge shall disqualify himself in a proceeding in which the judges impartiality might be reasonably questioned). By violating the Code of Judicial Conduct, respondent has also violated Rule 7(a)(1)(it shall be ground for discipline for judge to violate Code of Judicial Conduct) and 7(a)(6) (it shall be ground for discipline for judge to consistently fail to timely issue orders, decrees, opinions or otherwise perform official duties without just cause or excuse) of the Rules for Judicial Disciplinary Enforcement, Rule 502, SCACR.

## *CONCLUSION*

We find respondent's misconduct as set forth in Agreement # 1 warrants a public reprimand. We find respondent's misconduct as set forth in Agreement # 2 warrants a thirty (30) day suspension from judicial duties. We therefore accept the two Agreements for Discipline by Consent and hereby publicly reprimand respondent and suspend him from his judicial duties for thirty (30) days.

**PUBLIC REPRIMAND; SUSPENSION.**

TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.